CITY OF ALVIN, et al., & Texas–New Mexico Power Company, Appellants,

v.

PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.

No. 3–92–459–CV.

Court of Appeals of Texas, Austin.

Aug. 25, 1993.

Rehearing Overruled June 1, 1994.

Barbara Day, Butler, Porter, Gay & Day, Austin, for the Cities.

Michael G. Shirley, Johnson & Gibbs, Austin, for Texas–New Mexico Power Co., appellant/appellee.

Dan Morales, Atty. Gen., Elizabeth R.B. Sterling, Asst. Atty. Gen., Austin, for PUC, appellee/appellant.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

ABOUSSIE, Justice.

Texas–New Mexico Power Company ("TNP") filed a statement of intent to change rates with the Public Utility Commission of Texas (the "Commission"). *See* Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ. Stat.Ann. art. 1446c, § 43 (West Supp.1993). TNP requested a rate increase to recover the costs associated with its generating facility

known as TNP One Unit 1. At that time TNP had also begun construction of a second facility, known as TNP One Unit 2. The Commission issued its final order in Docket 9491, which granted in part TNP's requested rate increase. The Commission found that TNP's decision to construct Unit 1 was prudent but denied recovery of some costs associated with its construction. The Commission also found that TNP's decision to construct Unit 2 was imprudent.

TNP and certain cities ("the Cities")[1] sought judicial review of the order in district court under section 19 of the Administrative Procedure and Texas Register Act ("APTRA"), Tex.Rev.Civ.Stat.Ann. art. 6252–13a (West Supp.1993). The district court affirmed the Commission's order in the main, but it reversed portions of the order disallowing certain costs TNP incurred on Unit 1 and remanded the docket to the Commission for further proceedings regarding these costs. The Cities and TNP appeal the district court's judgment insofar as it affirms the Commission's order. The Commission and the Cities appeal the district court's reversal of portions of the Commission's order. Overall, TNP brings thirteen points of error, the Cities bring four points, and the Commission brings one point.

## AUTHORITY TO CONSIDER UNIT 2'S PRUDENCE

TNP's second point of error asserts that the Commission was without statutory authority to decide whether TNP had proven the prudence of its decision to construct Unit 2 because TNP did not request rate-base treatment or decisional-prudence findings as to Unit 2. The parties dispute whether TNP in fact made such a request.

■ The Commission first asserts that TNP initially pleaded this issue in its petition to change rates filed with the Commission. Paragraphs X and XI of the petition sought only recovery of the costs associated with Unit 1. The Commission, however, notes that paragraph V incorporated all the testi-

---

1. The Cities were intervenors in the Commission proceedings. They include the Cities of Alvin, Angleton, Aubrey, Booker, Brazoria, Crawford, Darrouzuett, Farmersville, Follett, Fort Stockton, Glen Rose, Gordon, Kermit, La Marque, Lewisville, Morgan, Nocona, Olney, Perryton, Petrolia, Spearman, Strawn, Sweeny, Talco, and Tom Bean.

mony and data that TNP filed along with its petition. The Commission then refers to several instances where this testimony and data discussed Unit 2's prudence. TNP argues that the Commission is pointing unfairly to isolated references in an expansive collection of documents and contends that any evidence introduced about the prudence of constructing Unit 2 concerned common costs of Units 1 and 2. Although the Commission disputes this contention, the record indicates that TNP introduced evidence about Unit 2 to bolster its proof of the prudence of Unit 1 costs. The two units were part of a plan that originally envisioned the construction of four similar units by TNP; therefore, TNP was particularly interested in convincing the Commission that the first of these plants, Unit 1, was constructed prudently.

TNP points out that, although it gave no notice to the public that the prudence of the decision to begin Unit 2's construction would be an issue in this proceeding, the Commission concluded that TNP's notice adequately satisfied the requirements in section 43 of PURA and the Commission's own rule, 16 Tex.Admin.Code § 21.22 (1988). TNP further notes that, had the Commission considered the Unit 2 prudence issue, section 13(b)(4) of APTRA required it to provide TNP notice of such consideration ("Notice must include ... a short and plain statement of the matters asserted."). The Commission did not provide TNP such notice.[2]

■ Viewing the record as a whole, we find that TNP's initial petition did not ask the Commission to decide whether the decision to construct Unit 2 was prudent. However, the Commission also contends that this issue was tried by consent when TNP failed to request in its rate-filing package that the Commission should not make findings on Unit 2 or to object specifically object when the issue was raised during cross-examination of witnesses at the agency hearing. The Cities further cite portions of TNP's filed package, its post-hearing brief, and its objections to the examiners' report supporting the prudence of the decision to construct Unit 2.

As discussed above, the record shows that TNP introduced such evidence to bolster its proof of the prudence of Unit 1 costs. The examiners' report also indicates which issues TNP actually presented in this proceeding. The examiners were concerned that TNP's Board of Directors had decided initially that Unit 2 would be too costly to construct. At a later board meeting, the board members studied several documents, including a life cycle analysis and a financial analysis, and subsequently decided to proceed with construction. The examiners were dismayed by "the failure of TNP to place such critical documents into the record." The report concludes:

> Because the revised financial forecasts, the final Sargent & Lundy report, the life cycle analysis performed for Unit 2, and the summaries presented to the Board of Directors were not offered by TNP and are not in the record in this proceeding, *this Commission is unable .independently to assess the prudence of TNP's decision to release Unit 2 for construction.*

(Emphasis added). Commissioner Marta Greytok, who dissented from the Commission's order on this issue, stated that a complete record was necessary before the Commission decided whether TNP had met its burden of proof. TNP's failure to introduce critical evidence in its possession indicates that TNP never intended for the issue to be determined in this agency proceeding.

TNP's objections to the examiners' report complained that Unit 2's prudence was not an issue in the proceeding. TNP subsequently repeated this argument when it filed a motion to clarify or limit the issues involved in the proceeding. Finally, TNP offered to withdraw this issue from consideration, an option TNP retained until the Commission issued its final order. *See* 16 Tex.Ad-

**2.** The Commission and the Cities assert that TNP has no standing to raise the issue of public notice. The Cities also contend that TNP has waived the issue of the Commission's notice to TNP by failing to include this point in its original motion for rehearing (although TNP filed an amended motion raising this point). We do not

address these arguments, as the issue we decide is whether TNP actually presented Unit 2 prudence as an issue in the proceeding before the Commission. The lack of notice to both the public and TNP is merely evidence in the record supporting TNP's position that it did not present this issue to the Commission.

min.Code § 21.82(b) (1988). Examining the record as a whole, we find that the issue was not tried by consent. Accordingly, we hold that the Commission lacked the authority to decide the prudence of constructing Unit 2. We sustain TNP's second point of error. We need not reach TNP's third point, which complains that the Commission's findings on the prudence of constructing Unit 2 are not supported by substantial evidence and are arbitrary and capricious.

## PRUDENCE REVIEW

In TNP's first point of error, it asserts that the Commission incorrectly conducted a review of the "prudence" of TNP's decisions to incur capital expenses. TNP contends that PURA does not authorize the application of a prudence standard to the determination of invested capital. Under this point of error, TNP seeks only a reversal of the Commission's determination of the prudence of TNP's decision to construct Unit 2. Because it prevailed on other grounds in the district court as to Unit 1 costs, TNP expressly limited its argument under this point to Unit 2 prudence. In light of our resolution of TNP's second point of error concerning TNP's decision to construct Unit 2, we do not reach this point of error.

Although TNP did not seek any relief under this point from the Commission's determination that certain costs incurred on Unit 1 were not prudent, TNP's argument under its first point of error offers an alternative ground to affirm the district court as to Unit 1. TNP has not raised this argument by cross-point or reply point in response to the Cities' points of error one and four and the Commission's sole point of error. Assuming that TNP has preserved the argument for appeal and construing the briefing rules liberally, however, we will examine the merits of the argument to the extent it may apply to any of the Commission's prudence findings.

The only express mention of a prudence standard in PURA is in section 41(a), which contains the test for placing construction work in progress (CWIP) in rate base: "[CWIP] shall not be included ... to the extent that such projects have been inefficiently or imprudently planned or managed." TNP did not request the inclusion of CWIP in rate base for either Unit 1 or 2. TNP contends that the only appropriate standard for considering rate base expenses where CWIP is not involved is elsewhere in section 41(a): "Utility rates shall be based upon the original cost of property *used by and useful* to the public utility in providing service." (Emphasis added). Once the Commission finds rate base expenses are used and useful, TNP contends, it cannot disallow them because of their imprudence. Rather, the Commission must manipulate the rate of return a utility is allowed on its invested capital in order to protect ratepayers from unreasonable rates, as section 39(a) of PURA empowers the Commission to do.

Regulatory agencies today use separate tests in determining what expenses should be included in a utility's rate base—the "used and useful" requirement in section 41(a) of PURA and the requirement that capital expenses be prudently incurred.[3] *See* Ernest Gellhorn & Richard J. Pierce, Jr., Regulated Industries 106–12 (1987); *see also Appeal of Conservation Law Found.,* 127 N.H. 606, 507 A.2d 652, 674 (1986) (utility properly receives a "reasonable rate of return [on] used and useful property, provided that cost may not include anything imprudently wasteful"); *Alliance for Affordable Energy of New Orleans,* 578 So.2d 949, 976 (La.App.), *judgm't vacated,* 588 So.2d 89 (La.1991) (wasteful expenditures must be excluded from rate base).

■ PURA requires that rates set by the Commission must always be just and reasonable. §§ 2, 38. This Court has noted but declined to express an opinion upon "the possible existence of a distinction between the reasonableness standard guiding the [Commission] in setting rates and the pru-

---

3. Originally, courts used this prudence standard to review whether a regulatory agency's decision kept a utility's rate so low as to violate the federal constitution's takings clause. *See Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n,* 262 U.S. 276, 289 n. 1, 43 S.Ct.

544, 547 n. 1, 67 L.Ed. 981 (1923) (Brandeis, J., concurring) (interpreting U.S. Const., amend. V); *see also Railroad Comm'n v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559, 573 (1956).

dence standard it uses pursuant to PURA § 41(a) [regarding CWIP]." *City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 905 n. 3 (Tex.App.—Austin 1992, writ granted). At oral argument, the Commission explained that the prudence standard it uses for calculating non-CWIP rate base expenses, although not expressly contained in PURA, is a long-recognized ratemaking method that furthers the legislative intent behind the reasonableness requirement in PURA. This Court has stated that "when a statute imposes a mandatory duty upon a governmental agency to carry out the express and specifically defined purposes and objectives stated in the law, such statute carries with it by necessary implication the authority to do whatever is reasonably necessary to effectuate the legislative mandate and purpose." *Corzelius v. Railroad Comm'n,* 182 S.W.2d 412, 415 (Tex.Civ.App.—Austin 1944, no writ).

■ The supreme court has described the standard that the Commission should use when calculating rate base expenses as "prudence and reasonableness." *Texas–New Mexico Power Co. v. Texas Indus. Energy Consumers,* 806 S.W.2d 230, 233 (Tex.1991); *Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n,* 798 S.W.2d 560, 563 (Tex.1990), *cert. denied,* 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). TNP admitted at oral argument that no difference existed between a reasonableness standard and a prudence standard.[4] Nonetheless, it asks us to hold that the Commission must include in rate base any expenses found used and useful, even if they are imprudent or unreasonable. We decline to do so. Following the language of the supreme court and furthering the Commission's ability to achieve the reasonableness requirement mandated by the legislature in PURA, we

hold that the Commission correctly disallows rate base expenses that a utility fails to prove are prudent and, therefore, just and reasonable.

■ We do not interpret PURA, as TNP suggests, as requiring the Commission to adjust the rate of return on rate base instead of fine-tuning the amount of invested capital by disallowing individual, unreasonable expenses. This latter method better enables the Commission to review the evidence and make a decision directly related to the proof of reasonableness that the utility presents. This method also allows easier judicial review under the substantial evidence standard. *See* APTRA § 19(e)(5). Courts would find it difficult to review the Commission's decision to lower the rate of return based upon its findings that certain rate base expenses were unreasonable; the indirect nature of such ratemaking could lead to complaints about the arbitrariness of Commission decisions and inhibit the courts' ability to determine the relationship between the underlying findings of fact and the rates themselves. We reject TNP's argument under its first point of error to the extent it offers an alternative ground to affirm the district court's conclusion as to Unit 1 costs.

### CHANGE ORDER NO. 4

The Commission's sole point of error and the Cities' first and fourth points of error complain that the trial court erred when it found that the Commission's conclusion of law 22, which disallowed $39,508,409 in expenses from inclusion in Unit 1's rate base, is not supported by substantial evidence and is also arbitrary and capricious, insofar as this conclusion disallowed costs incurred by a Change Order No. 4 and increased costs for a natural gas pipeline.[5]

**4.** The Commission defined the prudence standard it used in this proceeding in conclusion of law 11:

> Prudence is defined as the exercise of that judgment and the choosing of one of that select range of options which a *reasonable* utility manager would exercise or choose in the same [or] similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

(Emphasis added).

**5.** TNP argues that the district court found conclusion of law 22 invalid in its entirety—in other words, that the entire $39,508,409 disallowance was insupportable. This amount included other costs besides Change Order No. 4 and the gas pipeline that the Commission found were imprudently incurred. The district-court judgment clearly states, *"[B]ecause of the foregoing errors* [regarding Change Order No. 4 and the pipeline],

TNP contracted with WCZ Consortium ("the Consortium") to build Unit 1. The parties entered into numerous contract amendments, called change orders, before completion of Unit 1. TNP was anxious for Unit 1 to achieve "preliminary acceptance" so that its subsidiary, Texas Generating Company ("TGC"), could assume legal ownership. Preliminary acceptance is defined in the contract as continuous operation for 15 hours in one day at 70% of the unit's Facility Warranted Output. The contract required the Consortium to reach preliminary acceptance by June 1, 1990, or incur liability for failing to do so.

Construction of Unit 1 started later than the parties originally envisioned because of the Commission's delay in issuing TNP a certificate of convenience and necessity ("CCN") that allows a utility to construct its own generating plant. In order to achieve preliminary acceptance by June 1, 1990, TNP agreed to Change Order No. 4. The Consortium would not be liable for debt service resulting from its failure to achieve preliminary acceptance before October 15, 1990. The change order deducted $10 million from the fixed price of the contract and designated this amount an "Early Completion Payment" that would grow progressively smaller from June 1 to October 15, 1990, in proportion to the amount of debt service for which the Consortium would have previously been liable.[6] TNP also paid the Consortium an extra $7,680,000 as a "Compressed Schedule Payment" for achieving preliminary acceptance. Finally, Change Order No. 4 shifted the risk of ordinary force majeure performance delay from TNP to the Consortium in return for a $10 million payment.

*Standard of Review*

Courts are entitled to review agency decisions under section 19(e) of APTRA. Courts may reverse an administrative order if it lacks substantial evidence supporting it or if it is arbitrary and capricious. APTRA § 19(e)(5), (6).

In *City of League City v. Texas Water Commission*, 777 S.W.2d 802 (Tex. App.—Austin 1989, no writ), we summarized the substantial evidence test: (1) the findings, inferences, conclusions, and decisions of an agency are presumed to be supported by substantial evidence, and the burden is on the party contesting the order to prove otherwise; (2) in applying the test, the reviewing court is prohibited from substituting its judgment for that of the agency as to the weight of the evidence of questions committed to agency discretion; (3) substantial evidence is more than a scintilla, but the evidence in the record may preponderate against the decision of the agency and nonetheless amount to substantial evidence; (4) the true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency; and (5) the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Id.* at 805 (citing *Texas Health Facilities Comm'n v. Charter Medical–Dallas Inc.*, 665 S.W.2d 446, 452–53 (Tex.1984)).

If an agency's actions are not supported by substantial evidence, they are also arbitrary and capricious. *Charter Medical*, 665 S.W.2d at 454. Even if supported by substantial evidence, though, an agency action may be arbitrary and capricious if, for example, the agency has totally failed to make findings of fact and instead based its decision on findings in another case, *Railroad Comm'n v. Alamo Express*, 158 Tex. 68, 308 S.W.2d 843, 846 (1958), or if the agency has based its decision on legally irrelevant factors, or failed to consider legally relevant factors. *Consumers Water, Inc. v. Public*

the Commission's decision to deny $39,508,409 in capital costs for TNP One Unit 1 is not supported by substantial evidence and is arbitrary and capricious. *In all other respects the points of error raised by the plaintiffs are denied, and the Order in docket 9491 is affirmed."* (Emphasis added). We interpret the district-court judgment as remanding the docket to the Commission to recalculate the total disallowance without considering Change Order No. 4 and the pipeline and as affirming the remainder of the disallowed costs in conclusion of law 22.

6. The Consortium actually received $9,107,846 when Unit 1 achieved preliminary acceptance on June 8, 1990.

*Util. Comm'n,* 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ).

*Compressed Schedule Payment*

■ We find that substantial evidence supports the Commission's disallowance of the Compressed Schedule Payment. TNP admits that it desired preliminary acceptance so that ownership of Unit 1 would transfer to TGC, although TNP does not claim this transfer is proof of the prudence of the payments in Change Order No. 4. However, TNP asserts that it saved $14.9 million in ratchet payments to Houston Lighting & Power and $6 million in energy charges by achieving preliminary acceptance before the peak summer season. The Commission and the Cities contend that these savings would occur only if Unit 1 achieved commercial operation, not merely preliminary acceptance.[7]

The district court also found that the Commission's disallowance of the Compressed Schedule Payment was arbitrary and capricious. TNP contends that the Commission's finding of fact constituted an arbitrary use of hindsight, a legally irrelevant factor. *See Consumers Water,* 774 S.W.2d at 721.

Finding of fact 122a states, "TNP's decisions to incur the Compressed Schedule Payment and the Early Completion Payment were not prudent because Unit 1 did not attain commercial operation until September 12, 1990." TNP asserts that the Commission unfairly relied upon knowledge obtained after-the-fact about the actual attainment of commercial operation. We do not interpret the Commission's finding as using such hindsight. The finding explains the Commission's rejection of TNP's contention that it reasonably believed that it was saving $20.9 million through its payments to the Consortium. Finding of fact 122 stated that these potential savings were related to completion, not preliminary acceptance. Finding of fact 122a contains the September 12th date to emphasize that the desired June 1st preliminary acceptance date was entirely unconnect-

ed to the potential savings. TNP's payments would have been prudent only if its goal *at the time* had been full commercial operation by early summer. The Commission found that the delay in achieving commercial operation until September 12th was evidence that early-summer operation was not TNP's goal.

■ TNP also contends that the Compressed Schedule Payment was required by section 7.01 of the construction contract, which provides that the Consortium would receive an equitable adjustment in case of delay.[8] However, the *Commission's* delay in issuing a CCN to TNP caused any delay in starting Unit 1's construction. Section 7.01 calls for an adjustment only if delay is caused by acts or omissions of *TNP or third parties contracting with TNP.* The Commission concluded that its own actions causing delay would not require an adjustment under this provision. We cannot hold that this interpretation is unreasonable.

We hold that the Commission's disallowance of the Compressed Schedule Payment as imprudent is supported by substantial evidence and is neither arbitrary nor capricious.

*Early Completion Payment*

■ The district court found that the Commission's disallowance of the Early Completion Payment was not supported by substantial evidence. We agree. The evidence in the record shows that the Early Completion Payment did not increase the amount TNP paid to the Consortium. Instead, Change Order No. 4 merely deducted $10 million from the fixed price of the contract and designated this amount as a pass-through cost instead. The Early Completion Payment was designed to diminish at the same rate the original contract price would have diminished had the Consortium remained liable for debt service payments resulting from delaying preliminary acceptance past June 1, 1990. The issues of preliminary acceptance and commercial operation are not relevant to an agreement that did not increase Unit 1 costs. The Commission thus

---

7. *Cf.* 16 Tex.Admin.Code 23.21(c)(2)(E)(iii) (Supp.1993) (commercial operation for nuclear plants requires 100 hours at 95–100% output).

8. The examiners' report states that section 9.02 of the contract is the relevant clause. However, both TNP and the Commission only refer to section 7.01 in their appellate briefs.

improperly based its disallowance of the Early Completion Payment on these factors in finding of fact 122a. Because no other evidence supports the disallowance, it is not supported by substantial evidence.

### Force Majeure Payment

■ The district court also reversed the Commission's disallowance of TNP's payment that shifted the risk of ordinary force majeure from TNP to the Consortium. TNP contends that its lenders required this payment. However, the record reflects that TNP's lenders merely required *some* allocation of all risks, not a particular allocation of this risk to the Consortium. TNP's own witness testified that the original contract's allocation of force majeure risk to TNP satisfied its lenders.

TNP next contends that it saved various costs, including ratchet and energy charges, by shifting the risk of ordinary delay to the Consortium. TNP presented no evidence to the Commission supporting this claim. A life cycle analysis TNP performed on cost increases caused by delay was not introduced at the agency hearing. The risk of regulatory force majeure, in any event, remained with TNP. As the delay in construction resulted from the late issuance of the CCN, it is questionable whether any additional expenses caused by the delay were in fact assignable to the Consortium.

TNP also asserts that force majeure insurance is expensive to purchase. The Commission responds that a payment of $10 million was imprudent when evidence showed that force majeure insurance would have cost only $625,000. At any rate, TNP was obligated by Change Order 4 to bear the expense of the Consortium's purchase of force majeure insurance. TNP contends that insurance was difficult to obtain, but the record does not show that obtaining insurance was impossible. We hold that substantial evidence supports the Commission's finding that TNP failed to prove that the force majeure payment was prudent. We also hold that this finding was neither arbitrary nor capricious; TNP makes no additional arguments on this issue.

### NATURAL GAS PIPELINE

TNP and the Consortium first agreed to Change Order No. 1, which added $1.3 million to the fixed contract price for the installation of natural gas pipelines. The Commission found that this cost was incurred prudently. However, Change Order No. 9, Item 2 then increased the contract price by $374,638 because the gas supplier required larger-sized pipes and a specific point of connection with the main gas line. The Commission disallowed this expense because it found that TNP imprudently failed to obtain these specific requirements from the gas supplier before signing Change Order No. 1. The district court found that the Commission's finding was not supported by substantial evidence and was arbitrary and capricious.

■ Gordon Van Sickle, a witness for the Commission's General Counsel, testified that TNP did not obtain information about pipe size and connection because it signed Change Order No. 1 hurriedly. TNP presented no opposing evidence. Instead, it relies upon another statement made by Van Sickle. Although he found TNP's actions imprudent, he believed the extra $374,638 charged by Change Order No. 9 *might* have been unavoidable even if TNP had obtained the specific requirements before signing Change Order No. 1. TNP does not challenge conclusion of law 17, which assigned TNP the burden of proving that costs resulting from imprudent decisions were nonetheless unavoidable. *See* PURA § 40. The Commission found that Van Sickle's opinion that the costs might be unavoidable was not sufficient evidence to meet this burden. When weighing expert testimony, the Commission may accept or reject part or all of each witness's conclusions; it is the final judge regarding the credibility and validity of such testimony. *Southern Union Gas Co. v. Railroad Comm'n,* 692 S.W.2d 137, 141–42 (Tex.App.—Austin 1985, writ ref'd n.r.e.). The Commission's refusal to accept a speculative portion of Van Sickle's testimony was not unreasonable. We hold that substantial evidence supports the Commission's finding disallowing a portion of the natural gas pipeline expenses. As TNP presents no addition-

al arguments, we also hold that this finding is neither arbitrary nor capricious.

### SUPPORTING FINDINGS OF FACT

In defending the trial court's reversal of the Commission's findings on the Early Completion and Compressed Schedule payments, and in support of several of its points of error, TNP asserts that the Commission violated section 16(b) of APTRA, which provides, "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

A finding of fact set forth in statutory language is either a mandatory finding set forth in the relevant enabling act or a finding that represents a criterion the legislature has directed the agency to consider in performing its function. *Charter Medical,* 665 S.W.2d at 451; *City of El Paso,* 839 S.W.2d at 908; *Pedernales Elec. Coop. v. Public Util. Comm'n,* 809 S.W.2d 332, 339 (Tex.App.— Austin 1991, no writ). Conclusion of law 22 is an ultimate, statutorily-mandated finding of fact requiring underlying findings of fact. It stated, "$39,508,409 of TNP's Unit 1 capital costs should not be included in TNP's rate base as invested capital used and useful in rendering service to the public pursuant to PURA Sections 38, 39, and 41."

■ TNP asserts that the Commission's finding of fact 126 that disallowed the payments contained in Change Order No. 4 does not contain underlying findings of fact. However, this finding is not set forth in statutory language. It merely supports the ultimate finding in conclusion of law 22.[9] Moreover, the Commission merely found that TNP failed to meet its burden of proving that the Change Order No. 4 payments were prudent. *See* PURA § 40. Such a negative finding need not be supported by evidentiary findings of facts. Moreover, findings of fact 109 through 125 support the Commission's decision to disallow the Change Order No. 4 payments.

We sustain that part of the Commission's point of error and the Cities' first and fourth

points of error challenging the district court's reversal of the Commission's disallowance of the Compressed Schedule Payment, the Force Majeure Payment, and the increase in the natural gas pipeline expenses incurred by Change Order No. 9, Item 2. We overrule that part of the Commission's point and the Cities' first point challenging the district court's reversal of the Commission's disallowance of the Early Completion Payment.

### OWNERSHIP OF UNIT 1

■ The Cities' second point of error contends that the trial court erred in affirming the Commission's inclusion of Unit 1 in rate base. The Cities claim that TNP did not have a sufficient interest in the facility. Section 39(a) of PURA states that a utility may "earn a reasonable rate of return on *its* invested capital." (Emphasis added). Section 41(a) further provides, "Utility rates shall be based upon the original cost of property.... Original cost shall be the actual money cost ... of the property at the time it shall have been dedicated to public use ... *by the utility which is the present owner.*" (Emphasis added). PURA thus envisions that the utility must have made a significant investment in the property, an investment in the nature of "ownership."

■ Originally, Project Financing Corporation ("PFC"), a subsidiary of the Consortium, owned Unit 1. PFC borrowed $345 million from lenders to construct Unit 1. Upon preliminary acceptance, PFC transferred legal ownership of Unit 1 and responsibility for the construction loans to TNP's subsidiary, TGC. TNP was the "alter ego" of TGC; TGC's sole assets consisted of the legal title to Unit 1 and $10,000 TNP used for TGC's initial capitalization. TNP was unable to give its preferred lenders a first lien interest in Unit 1 because of previous liens on Unit 1 TNP granted its primary lender. Therefore, TNP created TGC so that this new entity could receive lower interest rates from the preferred lenders. The Commission found that TNP saved ratepayers $447,000 through this plan.

---

9.  It also supports findings of fact 204 and 220, which detail the original cost of plant in service

that was used and useful and TNP's total invested capital.

TNP entered into an agreement with TGC in which TNP assumed repayment of the construction loans and other obligations, including operation of Unit 1. The Commission's conclusion of law 25 found this agreement crucial on the question of "ownership":

TNP is not precluded from seeking rate base treatment of Unit 1 although its wholly-owned subsidiary [TGC] holds legal title to the plant, because TNP retains all utility functions, owns the electrical output, receives the revenue from the sale of the electrical output, and is obligated to meet all financial commitments with respect to the construction loan.

The Cities raise two arguments in their point of error. First, they assert that TNP does not have a sufficient investment in Unit 1. The Cities note that TNP had not yet repaid the construction loans at the time it requested that the Commission include Unit 1 costs in rate base. The Commission and TNP reply that both debt and equity are often included in rate base. The Cities do not dispute the Commission's finding that TNP was obligated to repay the loan. The Cities refer to an earlier Commission order as authority for their position. That order is distinguishable as involving a mere intention to purchase property, not an already-incurred debt obligation. *See Application of Houston Lighting & Power Co. for Auth. to Change Rates,* Docket No. 8425, 16 Tex. P.U.C.Bull. 2199, 2268 (June 20, 1990). We hold that TNP's obligation to repay the construction loans for Unit 1 constitutes a sufficient investment on its part to satisfy PURA § 39(a).

▇▇▇▇ Second, the Cities contend that TNP does not own Unit 1 because TGC still holds the legal title.[10] Courts in other jurisdictions have adopted a "true ownership" test rather than relying on legal title as conclusive evidence of ownership. *See Colorado Interstate Gas Co. v. Federal Power*

*Comm'n,* 324 U.S. 581, 607, 65 S.Ct. 829, 841, 89 L.Ed. 1206 (1945) (ownership by wholly-owned subsidiaries not a difference in substance from direct ownership); *see also Central Maine Power Co. v. Public Util. Comm'n,* 150 Me. 257, 109 A.2d 512, 521 (1954) (subsidiary's possession of legal title unimportant if property entirely devoted to operations of parent company). In support of its decision in this proceeding, the Commission cited a previous order in which it suggested that a utility could include property owned by its wholly-owned subsidiary in rate base. *See Report of Gulf States Util. Co. of the Transfer of the Lewis Creek Power Plant to GSG & T,* Docket No. 7577, 15 Tex.P.U.C.Bull. 745 (August 30, 1989). Conclusion of law 25 refers to several indicia of TNP's ownership which, along with the fact that TGC was a wholly-owned subsidiary, are sufficient to satisfy PURA § 41(a). We hold that substantial evidence exists to support the Commission's finding that TNP had sufficient ownership of Unit 1 to include it in invested capital.[11] We overrule Cities' second point of error.

## FEDERAL INCOME TAX DEDUCTIONS

The Cities' third point of error asserts that the Commission improperly included a hypothetical federal income tax expense in cost of service. The Commission did not include two types of interest deductions in its calculations.

▇▇▇▇ First, it ignored TNP's deductions for interest paid on expenses that the Commission had disallowed from inclusion in rate base. The supreme court has held that a utilities income tax expense included in cost of service must reflect the actual taxes paid and that any tax savings "should inure to the benefit of the ratepayers." *Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 442 (Tex.1987). We have interpreted the actual-taxes-incurred test to

---

10. The Cities also suggest that the Commission should have reviewed the dealings between TNP and TGC as an affiliated transaction. *See* PURA § 41(c)(1). Because this point was not raised in their motion for rehearing of the Commission's order, it is waived. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 365 (Tex. 1983).

11. However, we disapprove of TNP's suggestion that any property dedicated to public use, regardless of ownership, must be included in rate base. Such a situation would not comport with PURA's requirement that the property actually be the utility's invested capital. *See* PURA § 39(a).

require that any tax benefits the utility realizes from its expenses that are disallowed for ratemaking consideration be passed through to ratepayers. *Public Util. Comm'n v. GTE–SW*, 833 S.W.2d 153, 169 (Tex.App.—Austin 1992, writ granted); *see also Cities of Abilene v. Public Util. Comm'n*, 854 S.W.2d 932, 945 (Tex.App.—Austin 1993, n.w.h.).

TNP and the Commission argue that section 41(c)(3) of PURA prohibits the Commission from considering any unreasonable expenses for purposes of ratemaking and that allowing the ratepayers to benefit from these tax deductions in effect punishes TNP's shareholders twice, as they must bear the burden of the disallowed expenses but do not receive the benefit of the deductions resulting from these expenses. We have previously rejected these arguments regarding disallowed non-capital expenses and similarly reject them as applied to disallowed capital expenses. *GTE–SW*, 833 S.W.2d at 169; *Southern Union Gas Co. v. Railroad Comm'n*, 701 S.W.2d 277, 279 (Tex.App.—Austin 1985, writ ref'd n.r.e.).

The Commission also failed to include in its calculation of income tax expenses a portion of the interest on capital expenses that *were* included in rate base. The deduction that TNP obtained for this interest did not result in a windfall to its shareholders.

■ The Cities contend that the "actual taxes incurred" language in *Houston Lighting* requires that the Commission pass on savings relating to a utility's tax deductions to ratepayers *immediately*. The Cities thus would have us hold that the amount included in rate of service must be the same as the utility's actual liability reflected on its tax form.[12] We held in *GTE–SW* that "there exists no contradiction between the 'normalization' requirement [of the Internal Revenue Service and Commission rules] and *Houston*

*Lighting.*" *GTE–SW*, 833 S.W.2d at 167. Tax savings must "inure to the benefit of the ratepayers." *See Houston Lighting*, 748 S.W.2d at 442. Section 27(e) of PURA directs the Commission to distribute these benefits to *all* ratepayers, however, both present and future. We will not interpret *Houston Lighting* as mandating that present ratepayers receive all the benefits of accelerated depreciation.

We sustain the Cities' third point of error regarding the interest deductions for disallowed expenses; we overrule this point regarding the Commission's use of normalization.

## PERFORMANCE STANDARD

In its fourth point of error, TNP complains that the district court erred in affirming the Commission's establishment of a performance standard for Unit 1. TNP maintains that this decision is not supported by substantial evidence and is beyond the Commission's statutory authority. We disagree.

■ A performance standard requires a utility to operate its facility at or above a certain output. The Commission adopted an eighty-three percent minimum capacity performance standard for Unit 1. The Commission also prohibited TNP from passing on to ratepayers additional purchased power costs incurred as a result of the failure of Unit 1 to operate at or above the eighty-three percent level.

TNP contends that the Commission's consideration of any performance standard was premature. TNP argues that by imposing such a performance standard, the Commission improperly anticipated future costs and limited the discretion of future Commissioners.

---

**12.** A utility depreciates its capital assets at an accelerated rate for federal income tax purposes, but it depreciates the same assets on a straight-line basis for ratemaking purposes. The resulting tax savings are accumulated in a deferred-tax account, which the Commission, in a later rate proceeding, subtracts from the rate base for the year at issue in the subsequent proceeding. This process, called "normalization," ensures that the interests of present and future ratepayers are balanced so that the former do not receive *all* the benefits of accelerated depreciation. Section 27(e) of PURA envisions such equitable balancing, although it does not specify normalization as the method that the Commission should use. In the present case, the Commission placed a portion of TNP's tax savings from the interest on capitalized expenditures in the deferred-tax account, thus excluding the savings from the cost of service in this proceeding.

■ We find substantial evidence in the record supporting the Commission's imposition of a performance standard. The Cities' witness, Daniel J. Lawton, recommended a performance standard of eighty-three percent for Unit 1. He testified that Unit 1 is a base load plant and that any deviation from expected performance levels would lead to higher rates for TNP's ratepayers because any decrease in Unit 1's generation of electricity would require TNP to purchase more power from other suppliers. The Commission allowed TNP to build Unit 1 in order to generate its own power, but the Commission was concerned that ratepayers would be forced to pay for both the cost of constructing Unit 1 and TNP's purchases of additional electricity. The Commission set the standard level upon TNP's prediction that, by efficiently operating at this level, it could offset the cost of constructing Unit 1.

The Commission could not easily predict Unit 1's fuel costs for the rate period and then adjust this prediction by rebates to ratepayers or fuel reconciliation proceedings, as TNP suggests. Lawton testified that Unit 1 uses a continuous fluidized bed technology, which no other plant in the United States uses. Therefore, Unit 1 could not be compared to industry standards or other similar generating facilities. By setting the performance standard based upon TNP's own predictions, the Commission believed that it could overcome this problem.

TNP asserts that some catastrophic event might occur causing TNP Unit 1 to fall below the required performance level. The Commission's rules explicitly provide for unforeseeable circumstances that cause a material underrecovery of fuel costs. 16 Tex.Admin.Code § 23.23(b)(2)(E) (Supp.1993). In such an event, TNP could request an emergency interim fuel factor; the Commission then must order an interim emergency fuel factor within thirty days. *Id.* at § 23.-23(b)(2)(E), (b)(2)(F)(i). Accordingly, TNP is protected from catastrophic occurrences.

TNP does not indicate how PURA prohibits the Commission from setting a performance standard. Section 16(a) of PURA provides:

The commission has the general power to regulate and supervise business of every public utility within its jurisdiction and to do all things specifically designated in this Act or implied herein, necessary and convenient to the exercise of power and jurisdiction.

Section 35(b) of PURA further provides:

[The Commission] may ascertain and fix just and reasonable standards, classifications, regulations, or practices to be observed and followed by any or all public utilities with respect to the service to be furnished; ascertain and fix adequate and reasonable standards for the measurement of the quantity, quality, pressure, initial voltage, or other condition pertaining to the supply of the service.

We conclude PURA authorizes the Commission to establish a performance standard for TNP Unit 1. "[T]he Legislature generally intends that an agency should have by implication such authority as may be necessary to carry out the specific power delegated." *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.).[13] We overrule TNP's fourth point of error.

## RETROACTIVE RATEMAKING

In its fifth point of error, TNP complains that the Commission's offset of TNP's corporate franchise tax refund against its rate case expenses constituted improper retroactive ratemaking. TNP also argues that this action is not supported by substantial evidence, is arbitrary and capricious, and is contrary to Commission precedent.

During TNP's test year for this rate case,[14] TNP received a refund for overpaid franchise

---

13. The Commission has also adopted a performance standard when dealing with the imposing task of regulating a nuclear-generated facility. *See Application of El Paso Elec. Co. to Establish Performance Standards for the Palo Verde Nuclear Generating Station,* Docket No. 8892, 17 Tex. P.U.C.Bull. 547, 567 (March 27, 1991).

14. A test year is a twelve-month period over which the Commission calculates the utility's "reasonable and necessary expenses" based on the utility's actual expenses for that period. The Commission can make adjustments for known and measurable changes. *See* 16 Tex.Admin.Code § 23.21(b) (Supp.1993).

taxes for the period from 1984 to 1987. The Commission amortized the tax refund and offset it against TNP's rate case expenses. The Commission found that this treatment was proper because both items were nonrecurring events.

TNP contends that the Commission's order violates article I, section 16 of the Texas constitution: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16. This provision applies to Commission orders because the supreme court has recognized that ratemaking is a legislative activity, even when delegated to an administrative body. *Houston Natural Gas Corp.*, 289 S.W.2d at 562. Like any other legislation, utility rates generally can have only prospective application and cannot be used to recoup losses or to account for gains incurred under prior legal rates. *See Texas Ass'n of Long Distance Tel. Cos. v. Public Util. Comm'n*, 798 S.W.2d 875, 882 (Tex.App.—Austin 1990, writ denied) (*TEXATEL* ). Simply put, retroactive ratemaking prohibits the Commission from setting rates either to allow a utility to recoup past losses or to refund excess utility profits to consumers. Stefan Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991–92 U.Ill.L.Rev. 983, 984 (1991).

In *Southern Union Gas*, 701 S.W.2d at 279–80, the Railroad Commission requested that the utility prepare and file an exhibit showing all investment tax credits received by the company since 1971. The Railroad Commission then spread the benefits received from the tax credits over the useful life of the property producing the credit and applied a ratable portion to the utility's test year. This Court held that the Railroad Commission's action did not constitute retroactive ratemaking. *Id.* at 280. We stated that the Railroad Commission had appropri-

ately allowed both present and future customers to share the benefit of the tax credit.[15] *Id.* We also noted that Southern Union had included the property that produced the tax credits in rate base, so that the Railroad Commission was merely returning a portion of the customers' funds to them. *Id.*

In this proceeding, the Commission adjusted TNP's expenses by the amount of the corporate franchise tax refund TNP received *during the test year*. This action was less arguably "retroactive" than the Railroad's Commission order in *Southern Union Gas*, which involved tax credits received more than a decade before the test year. The Commission did not account for the franchise tax refund in TNP's previous rate case because the refund was not received in that case's test year. In the present proceeding, the Commission merely credited TNP's ratepayers with a refund for taxes they had previously paid as part of cost of service. We hold that the Commission's action did not violate the constitutional prohibition.

TNP also contends that the Commission's action is not supported by substantial evidence. The record reflects that both the Commission's General Counsel and the Cities' witness, Jack E. Stowe, recommended that the Commission credit ratepayers with the tax refund, although the Commission accepted its General Counsel's recommendation about how to accomplish this credit.[16] TNP does not dispute that it received the refund during the test year period. We hold that substantial evidence supports the Commission's determination to amortize TNP's tax refund and offset it against TNP's rate case expense.

TNP also claims that the Commission's decision deviated from its previous orders and was therefore arbitrary and capricious. The Commission notes that a previous order, which failed to credit ratepayers with a franchise tax refund, involved a refund the utility may have received outside the test

---

15. *See* PURA § 27(e), which is virtually identical to the provision we cited as authority for the Railroad Commission's order in *Southern Union Gas*, the Gas Utility Regulatory Act. Tex.Rev. Civ.Stat.Ann. art. 1446e, § 4.01(e) (West Supp. 1993).

16. TNP asserts that it underrecovered other tax expenses from ratepayers during the period 1984–87. As these expenses are not in issue in this proceeding, such an assertion does not affect the validity of the Commission's order regarding the corporate franchise tax refund.

year. *Application of Houston Lighting & Power Co.,* 16 Tex.P.U.C.Bull. at 2417–18. In contrast, in another rate proceeding where the utility received the refund during the test year, the Commission credited it to ratepayers. *Application of El Paso Elec. Co. for Auth. to Change Rates,* Docket No. 9165, 16 Tex.P.U.C.Bull. 605, 788–90 (August 22, 1990). We hold that the Commission's order offsetting the tax refund against TNP's rate case expenses is neither arbitrary nor capricious and is not contrary to Commission precedent. We overrule TNP's fifth point of error.

## GOOD CENTS RIDER

■ In its sixth point of error, TNP complains that the district court erred in upholding the Commission's denial of TNP's Good Cents Home Rate Rider. TNP contends that this denial is not supported by substantial evidence, is arbitrary and capricious, and is not supported by Commission precedent. We disagree.

TNP asked the Commission to include a rider to its Good Cents rates. The rider would provide a rate reduction of one cent per kilowatt hour for all energy used during the winter months by members of TNP's Good Cents program.[17] TNP proposed that the rider would increase participation in its Good Cents Program and thus promote energy-efficient homes. The reduction offered under the rider would be in addition to existing one-time rebates for Good Cents homes.

The Commission declined to adopt the proposed rider. The General Counsel's witness, Danielle Jaussaud, testified that the rider would actually induce higher energy consumption in the winter due to the discount per kilowatt hour. She believed that the existing rebates sufficiently promoted participation in the Good Cents program, without encouraging a consistently higher level of winter consumption.

TNP notes that differences between summer and winter rates per kilowatt hour are common and suggests that the Commission's approval of rate differences in other proceedings makes the denial of the rider in this case arbitrary and capricious. The Commission responds that such rate differences generally apply to all customers and serve purposes other than energy savings. TNP's proposal was unusual because of its limited customer application and its goal of less consumption, a goal the Commission found unattainable. We hold that substantial evidence supports the Commission's denial of the proposed rider.

■ TNP also complains that the Commission's decision is arbitrary and capricious because it adopted the General Counsel's erroneous position that a previous Commission decision supported the General Counsel's recommendation in this proceeding. *See Application of Gulf States Util. Co. for Auth. to Change Rates,* Docket Nos. 7195 and 6755, 14 Tex.P.U.C.Bull. 1943, 2426 (May 16, 1988). The General Counsel explained that the Commission had found in the earlier proceeding that Gulf States' already-existing rider, which provided a ten percent discount for Good Cents participants for a three-year period, promoted the utility's marketing strategy rather than encouraged conservation. Accordingly, the Commission ruled there that the cost of providing the discount to consumers should rest exclusively with Gulf States' shareholders. We hold that the Commission's reliance upon its previous decision is neither arbitrary nor capricious. We overrule TNP's sixth point of error.

## OPERATIONS AND MAINTENANCE EXPENSES

In its seventh point of error, TNP contends that the Commission improperly disallowed certain operations and maintenance (O & M) expenses. TNP complains that this decision is not supported by substantial evidence and is arbitrary and capricious.

■ TNP requested that the Commission include in cost of service miscellaneous O & M expenses in the amount of $4,059,600. This figure consisted of the expenses of (1) limestone purchases, (2) insurance related to Unit 1, and (3) Unit 1 spare parts, training

---

**17.** Homes that qualified under the program met certain standards for thermal integrity and efficient, properly-sized heating and cooling equipment.

materials, tools, vehicle expenses, and equipment maintenance and overhauls ("other O & M").[18] In finding of fact 242, the Commission adopted the examiners' recommendation that the limestone and insurance expenses should be included in cost of service and that the other O & M totalling $3,107,100 should be disallowed.[19] TNP asserts that the Commission erred in its disallowance.

▬▬▬ TNP bore the burden of proving that its proposed rate changes were just and reasonable. PURA § 40; *see also Suburban Util. Corp.,* 652 S.W.2d at 363 ("[E]xpenses are limited to amounts actually realized or which can be anticipated with reasonable certainty."). A utility's failure to meet this burden requires a disallowance. *See Coalition of Cities,* 798 S.W.2d at 563–64. Further, the Commission may only consider post-test-year adjustments for known and measurable changes to historical test-year data where the attendant impacts on all aspects of a utility's operations can be with reasonable certainty identified, quantified, and matched. 16 Tex.Admin.Code § 23.21(a) (Supp.1993).

▬▬ TNP's witness Wright did not identify or quantify the specific parts, training materials, tools, vehicles, or equipment involved in TNP's request. Rather, he merely testified that TNP would spend $3,107,000 on these expenses. TNP even failed to apportion the $3,107,100 among the various categories of expenses. Although the Commission's

18. TNP requested several post-test-year adjustments to its test-year expenses for Unit 1, including the miscellaneous expenses at issue here, because these expenses did not occur until after the test year. The Commission's rules allow for consideration of such post-test-year adjustments. *See* 16 Tex.Admin.Code § 23.21(a), (b) (Supp. 1993)..

19. The exact amount of the limestone and insurance expenses is difficult to ascertain from the record. The Commission's finding of fact 242 refers to a "Schedule II" in the examiners' report; however, the copy of this schedule in the record is incomplete. The examiners recommended that $74,974 be deducted from TNP's insurance expenses, an adjustment that TNP does not contest. In the district court, TNP asserted that the Commission disallowed $3,168,745 in other O & M and insurance expenses. The Commission also refers to this amount on appeal. TNP's appellate brief, however, refers to a disallowance of $3,198,172.

General Counsel's witness Van Sickle testified that TNP's request for other O & M was reasonable, he admitted that he reached this conclusion solely by looking at similar O & M expenses of other Texas lignite and coal plants, which were difficult to compare with Unit 1, a continuous fluidized bed plant. The examiners concluded that TNP had not met its burden of proof that the other O & M expenses were "reasonable and necessary" as mandated by section 40 of PURA and the "known and measurable" test under the Commission's rule, 16 Tex.Admin.Code § 23.-21(a) (Supp.1993). We hold that the Commission's conclusion is supported by substantial evidence and is neither arbitrary nor capricious. We overrule TNP's point of error seven.

## NON–UNIT 1 LABOR EXPENSE

In its eighth point of error, TNP complains that the Commission's findings regarding TNP's non-Unit 1 labor expense are not supported by substantial evidence and are unaccompanied by underlying findings of fact.

▬ TNP requested an increase of $981,-597 in test-year labor costs unrelated to Unit 1. Cities' witness Stowe recommended that $411,000 of this request should not be included in cost of service. The Commission adopted this recommendation. TNP complains that Stowe used data from the first quarter of 1990 when second quarter data

The exact amount of the limestone and insurance expenses is important only to the extent that TNP asserts the Commission inadvertently disallowed $16,098 without explanation. (We note that in its motion for rehearing before the Commission, TNP claimed that $61,645 had been inadvertently omitted.) TNP points out that the examiners' report recommends including limestone expense of $353,500 and insurance expense of $524,126, for a total of $877,526. TNP claims that Schedule II shows that only $861,428 was actually included. Besides the problem of the incomplete record before us, TNP did not raise this issue before the district court and thus has waived its complaint on appeal. Tex. R.App.P. 52; *see also City of Lubbock v. South Plains Elec. Coop., Inc.,* 593 S.W.2d 138, 142 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). As the parties do not dispute that the Commission disallowed $3,107,000 for other O & M, we will assume for the remainder of our discussion that this figure is correct.

was available. Cities presented evidence that TNP's labor costs had decreased from the test year. Stowe stated that the first quarter data, after annualization, was appropriately representative of TNP's necessary labor expenses. We will not second-guess the Commission's decision to accept this expert opinion and supporting data. *See Southern Union Gas,* 692 S.W.2d at 141–42.

■ TNP also urges that the Commission's findings of fact 231 and 237, which adopted a schedule detailing the appropriate amount of labor expenses, are not supported by underlying findings of fact. Neither finding at issue is set forth in statutory language; therefore, no underlying findings of fact are necessary. *See Charter Medical,* 665 S.W.2d at 451. We hold that the Commission's order and findings on non-Unit 1 labor expenses are supported by substantial evidence and do not require underlying findings of fact. We overrule TNP's point of error eight.

## FACTORING EXPENSE

■ In its ninth point of error, TNP complains that the Commission's finding adopting the General Counsel's recommended adjustment to the factoring expense is not supported by substantial evidence.

TNP factors its billed account receivables to a credit company to reduce lag time in its collection. TNP asserts that there are two costs associated with this practice: (1) an interest cost, because the receivables are sold at a discount; and (2) a bad debt component, because receivables are sold with recourse. Instead of allowing TNP to recover the factoring expense, the Commission allowed the utility to include in cost of service an uncollectible *expense component related to bad debts in the absence of factoring.*

The General Counsel's witness Seybold recommended this course of action. She testified that, based on the test year, TNP's factoring expense exceeded the cost of other alternatives and that the ratepayers should not bear the unreasonable cost of TNP's cash management technique of choice. Although TNP offered evidence of the benefits of factoring and of the costs it would incur if forced to terminate its factoring practice, its own witness Cunningham agreed that the costs of factoring might exceed its benefits. The Commission had the discretion to accept Seybold's testimony. *See Southern Union Gas,* 692 S.W.2d at 141–42. We hold that substantial evidence supports the Commission's order and finding substituting a bad debt expense for the proposed factoring expense. We overrule TNP's point of error nine.

## COST OF EQUITY

In its tenth point of error, TNP complains that the Commission's finding establishing the rate of return on TNP's equity is arbitrary [20] and is not supported by underlying findings of fact.

In finding of fact 223, the Commission adopted a cost of equity of 12.5%.[21] TNP complains that the Commission erroneously adopted a rate of return that fell below the level recommended by witnesses for TNP and the General Counsel. TNP's witness Bolster, the Cities' witness Lawton, and the General Counsel's witness Wiley all testified describing their methods of calculation [22] and made recommendations concerning the appropriate cost of equity. Each witness suggested both a precise rate of return and an appropriate range, each admitting that calculating cost of equity is a subjective exercise, not capable of exact measurement. Bolster recommended a rate of 13.5% and suggested a range of 13.5% to 14.1% after taking into

---

**20.** TNP apparently asserts that the Commission's finding was arbitrary because it was unsupported by substantial evidence. These grounds of judicial review often are synonymous. *See Charter Medical,* 665 S.W.2d at 454.

**21.** The cost of equity is one element of the rate of return on a utility's invested capital. Other elements include long-term and short-term debt and preferred stock.

**22.** All three witnesses based their recommendation on a discounted cash-flow analysis based on a group of comparable companies. They each based their calculation, however, on different groups of comparable companies. Bolster and Wiley also did risk premium analyses.

account financial risk.[23] Lawton recommended a 12.0% rate and suggested a range of 11.57% to 13.07%. Wiley recommended a rate of 13.5% and suggested ranges based on four different methods of calculation: 13.4–14.45%, 11.2–12.3%, 12.1–13.1%, and 12.1–13.1%.

■ This Court has recognized that when the Commission's figure for cost of equity falls within the range of relevant evidence, substantial evidence supports the equity finding. *See GTE–SW,* 833 S.W.2d at 159. The Commission's finding that 12.5% was the appropriate cost of equity falls within the inferences that a reasonable mind could have drawn from the evidence. *See id.* In dealing with an imprecise figure such as cost of equity, the Commission's finding is supported by substantial evidence, since it fell within the range of expert testimony. *See id.*

TNP also contends that the Commission's finding is not supported by underlying findings of fact. Finding of fact 223 dealt with equity, while finding of fact 222 dealt with the other factors in establishing an overall rate of return. *See* n. 21, *supra.* The Commission's finding of fact 224, the ultimate finding required by section 39(a) of PURA, set the overall rate of return at 10.71%. Finding of fact 223 was not set forth in statutory language, so no underlying findings were needed. *See Charter Medical,* 665 S.W.2d at 451. We overrule TNP's tenth point.

■ TNP's eleventh point asserts generally that it was not afforded an opportunity to earn a reasonable return over and above its reasonable and necessary operating expenses. TNP's twelfth point complains that the Commission's rates were not just and reasonable. TNP makes no argument in its brief explaining these two points. Points of error must be supported by argument and authorities or they are waived. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex. 1983). Moreover, to the extent that these points are cumulative of TNP's previous points of error, we overrule them.

## SERVICE RULE 14B

In its thirteenth point of error, TNP asserts that the trial court erred in failing to remand this proceeding to the Commission for correction of a clerical error in its final order. The City of Lewisville attempted to persuade the Commission to delete a portion of TNP's Service Rule No. 14B. The examiners' report rejected this argument. TNP and General Counsel filed a Joint Motion for Revision of Examiner's Report and Order Nunc Pro Tunc to correct an alleged clerical error in the report's recitation of Rule No. 14B. The Commission adopted the examiners' substantive recommendation that it retain the rule, but it denied the joint motion by a general denial in its final order of all motions not otherwise specifically granted. The Commission on appeal agrees with TNP that the wording of the rule in the examiners' report included a clerical error because it failed to reflect the actual language of the rule as contained in TNP's Exhibit 22A admitted during the agency hearings.

■ The district court did not have the power to issue an order nunc pro tunc or command the Commission to make a clerical correction to its final order. TNP cites no basis under section 19(e) of APTRA within which judicial review of this type would lie. Accordingly, we overrule this point of error. We note that, because we are remanding this cause to the district court with instructions to remand the cause to the Commission, the Commission assumedly has the power to correct a true clerical error in its order after remand. If, as the Cities contend, a correction of the wording of Service Rule No. 14B results in a substantive change, the Cities would not be precluded from raising this issue in a future proceeding. We overrule TNP's thirteenth point of error.

## DISPOSITION

We hold that the district court erred in (1) reversing that part of the Commission's order disallowing the Compressed Schedule Payment, the Force Majeure Payment, and a portion of the increased costs for the installa-

---

**23.** Bolster estimated that the bare cost of equity was in the range of 12.8–13.0% under the discounted cash flow analysis and 13.25% under the risk premium analysis.

tion of a natural gas pipeline in Change Order No. 9, Item 2; (2) affirming that part of the Commission's order dealing with the prudence of TNP's decision to construct Unit 2 on the basis that this matter was not at issue in this proceeding; and (3) affirming that part of the Commission's order that failed to pass on to ratepayers TNP's federal income tax savings for expenses disallowed by the Commission. Accordingly, we reverse the district court's judgment and remand the cause to the district court with instructions that the cause be remanded to the Commission for proceedings not inconsistent with our opinion.